THE SEGUIN. THE FRANK ROCKEFELLER. THE SIR ISAAC LOTHIAN BELL.

(District Court, W. D. New York. October 7, 1909.)

Collision (§ 95*)—Steamer and Meeting Tow—Fault as Cause of Collision.

> The steamer Rockefeller was proceeding up the St. Clair river at night, with the steel barge Bell in tow on a line 600 feet long, which was the customary length, when a collision occurred between the Bell and the meeting steamer Seguin. The night was clear and calm. The vessels carried proper lights, including towing lights on the Rockefeller, which were seen by the Seguin, when a mile distant. Pursuant to an agreement, the steamers passed port to port at a distance of about 80 feet. *Held*, on the evidence, that immediately after passing the Seguin swung sharply to port, and brought on the collision, while the Bell did all that was possible to avoid it, and that the Seguin was solely in fault, and liable for the damage caused.

> [Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 200–202; Dec. Dig. § 95.*]

In Admiralty. Suit for collision by the Pittsburgh Steamship Company, as owner of the steel barge Sir Isaac Lothian Bell, against the steamer Seguin, and cross-libel against the Bell and the steamer Frank Rockefeller by the Parry Sound Lumber Company, as owner of the Seguin. Decree for libelant.

---

Hermon A. Kelley (Hoyt, Dustin, Kelley, McKeehan & Andrews and G. W. Cottrell, of counsel), for libelant.

Clinton & Clinton, for respondent.

HAZEL, District Judge. The steel barge Sir Isaac Lothian Bell, which was without cargo, and the Canadian steel steamer Seguin, loaded with lumber, collided in St. Clair river at about 8 o'clock on the night of November 14, 1906. The night was dark, but clear, and there was no objectionable wind. The barge, which was injured by the collision, was in tow of the whaleback steamer Frank Rockefeller, also without cargo, on a trip upbound from Lake Erie ports to Escanaba. The headlights displayed on the whaleback indicated that she had a barge in tow, and concededly the Seguin, which was downbound, perceived such lights when she entered the rapids at the head of the river a little over a mile distant. The tow line was 600 feet long, the customary length for towing barges of the dimensions of the Bell in the river in calm weather. The steamer Seguin, when entering the rapids of the river, initiated a port to port passing signal, to which the Rockefeller agreed, and immediately directed her course to starboard. The barge also ported her wheel, going to the right. The steamers passed port to port, with a distance of about 80 feet between them.

At the place of passing the navigable water is, according to the testimony, about 1,000 feet in width, and there is a current variously estimated by the witnesses at from 3½ to 5 miles an hour. There was ample water for the Seguin to navigate on her right or starboard hand; but directly after passing the Rockefeller she is claimed to have swung to port, or to the left, and toward the approaching barge. An alarm was immediately sounded by the Rockefeller, and directions were given by her master to release the tow line. The Seguin, however, went ahead on what is claimed to have been under a starboard helm at the rate of about 9½ miles an hour over the land, evidently unmindful of the proximity of the tow. Her master testified that he fully understood that the steamer had a barge in tow, and that he kept a lookout ahead, but that on account of the presence of smoke of a downbound steamer, which had collected on the American side of the river, he was unable to see the barge or her lights until she loomed out of the smoke probably 300 feet away; that she appeared to him to be coming straight on into the Seguin, which he testified was then heading probably a little east of south, while the barge was not following in the wake of the steamer, but was considerably out of her true course and well over to the westward, and towards the American side of the river; that the Bell ported, and violently swung several points to starboard in answer to her helm, to avoid the impending collision, but nevertheless, and in spite of the fact that the Seguin hard aported her helm, the vessels came together on an angle of about 45 degrees.

On the other hand, the Bell claims that she properly had the Rockefeller about two points on her port bow up to and just before the collision; that on the instant when the Seguin swung to port after passing the Rockefeller the Bell, fearing that the Seguin would come in collision with her, immediately hard aported and swung to starboard, but

the Seguin continued on her sheer or swing to port until she struck the barge a crushing blow on her port side, opposite her No. 3 hatch, injuring her hull. The Bell continued ahead under her port helm for about 700 feet to the Canadian shore where she grounded. The Seguin and the Bell, the principal participants in the collision, charge each other with fault. At the outset of the litigation the Rockefeller was also charged with fault for the disaster; but no testimony has been given attributing blame to her, and counsel for the respondent has not pressed any alleged fault against her, and therefore such charges are considered abandoned.

The river at the point of collision, abreast of Lynn's reporting station in Port Huron, as has been stated, was about 1,000 feet wide, and the steamer and barge were approximately 400 feet from the American shore. Capt. Wilson admits that at the time the Seguin passed the Rockefeller she was heading about a point across the latter's wake. This admission is an important factor against her. In view of her knowledge that the Rockefeller was incumbered with tow, her continuance in such a course certainly was perilous to herself and to the barge. It is probably true that she had not completed her turn from the Ft. Gratiot ranges at the head of the river, to head for the dock at Sarnia, her stopping point, on the Canadian side of the river; but, even if such was the fact, her position and course were critically dangerous and hazardous. According to the undisputed testimony, the joint speed of the vessels through the water was probably a little over 20 miles an hour, and obviously there was danger of coming in collision with the barge almost from the instant the Seguin passed the stern of the Rockefeller and swung to port, as I believe she did, notwithstanding her denial.

In view of the circumstances, I think she negligently and carelessly imperiled the safety of the barge, and her conduct in heading a point across the stern of the towing steamer was inexcusable. She is presumed to have known the customary length of the tow lines in St. Clair river, and she undoubtedly had a fair idea of the combined speed of the vessels and current of the river. Her conceded convergent course could only terminate in taking her almost directly across the tow line or into the barge. That a cloud of smoke enveloped the Bell, assuming such to have been the fact, and obstructed the view of the downbound steamer, will not exonerate her, or excuse the negligence of her officers. That there was smoke to obscure the view is positively contradicted by numerous witnesses for libelant, and I am persuaded that there was nothing at the time to obscure the view of the Seguin's master and lookout, who were on top of her pilot house. Had they exercised such diligence and reasonable caution as the situation demanded, they would have seasonably seen the barge, and probably recalled that the lights of the towing steamer gave notice to boats and their officers and crew that she had a barge in tow. The situation was such that the burden of avoiding the barge was on the Seguin. She was bound to exercise such a degree of viligance and carefulness as would avoid interference with the safety of the tow.

Considering the evidence in its entirety, it preponderatingly shows that the Seguin, immediately after she passed the stern of the Rocke-

feller, violently sheered or swung to port. Capt. Wilson testified that she first ported, and later, perceiving the Bell, he hard aported; that the vessel did not swing to starboard, as she should have done, but continued her swing to port. It is suggested that the force of the current interfered to prevent her helm from responding; but, whatever the cause of her port swing, it is evident that she was navigated carelessly and negligently, or that the vessel did not respond to the movements of her wheel. In either case she must be condemned.

The barge was not in fault. She displayed all the lights required by the statute, had a full complement of officers and crew, and her master was on the pilot house, observing the wheel and directing the wheelsman. The probabilities were that the tow was following the steamer, having her a little on her port bow, and in my estimation such probabilities are abundantly supported by the evidence. When the alarm signal was blown by the Rockefeller, the barge ported and swung to the east side of the river, the Seguin suddenly showing her green and red lights; but the next instant her red light disappeared, leaving the green only open to view. This certainly was an unmistakable warning of the sharp swing to port of the Seguin and across the wake of the steamer, menacing the safety of the barge. The Seguin blew one whistle, and was answered by the barge with an alarm, and the next thing the Seguin reversed her engines and the crash ensued.

The version of the occurrence by the master of the barge is corroborated, not only by the witnesses who were on the Rockefeller and the Bell, but by seemingly disinterested witnesses on the steamer Cort, and a witness who was in a rowboat in the river, and one who stood on the shore. They contradict the contention that the Bell was farther over toward the American shore than the towing steamer and in the pathway of the Seguin, and that, being in such position in the river, she ported her helm and swung four points to starboard. That theory is believed to be the single ground of fault imputed to the Bell, and, as it is not sustained, in my opinion, by the evidence, the Seguin must be held to have been solely and primarily at fault for the disaster.

A decree, with reference to the clerk to compute the amount of damages to the Bell, may enter, with costs.